# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PHILIP BAEHR,**

<div style="display:flex; justify-content:space-between;">

Plaintiff,

**COURT FILE NO.:**

</div>

vs.

**COMPLAINT**

**SYNGENTA CROP PROTECTION LLC,**
**SYNGENTA AG, and**                    **MDL No. 3004**
**CHEVRON U.S.A., INC.,**

JURY TRIAL DEMANDED

Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The plaintiff, PHILIP BAEHR (hereinafter referred to as "plaintiff"), by and through his attorneys, The Dietrich Law Firm P.C., alleges upon information and belief and complains of Defendants Syngenta AG ("SAG") and Syngenta Crop Protection, LLC ("SCPLLC") (together with their predecessors-in-interest, referred to collectively as the "Syngenta Defendants"); Chevron U.S.A., Inc. (together with its predecessors-in-interest, referred to collectively as the "Chevron Defendants"), and states:

## STATEMENT OF THE CASE

1. Plaintiff PHILIP BAEHR suffers from Parkinson's disease caused by his exposure to the herbicide Paraquat.

2. Plaintiff PHILIP BAEHR is currently a New York resident.

3. Defendants are companies that since 1964 have manufactured, distributed, licensed, marketed, and sold Paraquat for use in the United States, including New York.

4.    Plaintiff brings this action to recover damages for personal injuries resulting from exposure to Paraquat manufactured, distributed, and sold by Defendants.

5.    Defendants' tortious conduct, including their negligent acts and omissions in the research, testing, design, manufacture, marketing, and sale of Paraquat, caused Plaintiff's injuries.  At all relevant times, Defendants knew, or in the exercise of reasonable care should have known, that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment, and should have taken steps in their research, manufacture, and sale of Paraquat to ensure that people would not be harmed by foreseeable uses of Paraquat.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and each Defendant. Indeed, Plaintiff is a resident of New York; SPLLC is a Delaware limited liability company with its principal of business in Greensboro, North Carolina (SPLLC is a wholly-owned subsidiary of Defendant SAG); SAG is a foreign corporation with its principal place of business in Basel, Switzerland; and Chevron U.S.A., Inc. is a Pennsylvania corporation with its principal place of business in San Ramon in Contra Costa County, California.  Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

2

7.    The amount in controversy between Plaintiff and Defendants exceeds $75,000.00, exclusive of interest and cost.

8.    Venue is proper within this District pursuant to the direct filing Order under Case Management Order No. 1 for MDL No. 3004.  Absent said direct filing Order, Venue would be proper and/or where remand could be ordered by the Judicial Panel for trial in the United States District Court for the Western District of New York pursuant to 28 U.S.C. § 1391 in that the defendants conduct business there and are subject to personal jurisdiction in said district. Furthermore, the defendants sell, market and/or distribute Paraquat within the Western District of New York. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within said district.

## PARTIES

9.    At all times herein relevant the plaintiff PHILIP BAEHR has been a resident of the County of Niagara and the State of New York.

10.    At all times herein mentioned each and every of the Defendants was the agent, servant, employee, joint venturer, alter ego, successor-in-interest, and predecessor-in-interest of each of the other, and each was acting within the course and scope of their agency, service, joint venture, alter ego relationship, employment, and corporate interrelationship.

11.    U.K. manufacturer Imperial Chemical Industries Ltd. a/k/a Imperial Chemical Industries PLC ("ICI") first introduced Paraquat to the world markets in or about 1962 under the brand name GRAMOXONE®.

12. In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which was ultimately known as ICI Americas Inc. ("ICI Americas").

13. Chevron Chemical Company was a corporation organized under the laws of the State of Delaware.

14. Pursuant to distribution and licensing agreements with ICI and ICI Americas, Chevron Chemical Company had exclusive rights to distribute and sell Paraquat in the United States and did in fact manufacture, formulate, distribute, and sell Paraquat in the United States, including in New York for use in New York, from approximately 1964 until approximately 1986.

15. Chevron U.S.A. Inc. is the successor-in-interest to Chevron Chemical Company.

16. At all relevant times, Chevron Chemical Company acted as the agent of Chevron U.S.A. Inc. in selling and distributing Paraquat in the U.S. At all relevant times, Chevron Chemical Company was acting within the scope of its agency in selling and distributing Paraquat. Chevron U.S.A. Inc. is liable for the acts of its agents.

17. From approximately 1964 through approximately 1986, pursuant to distribution and licensing agreements with Chevron Chemical Company, SAG's and/or SCPLLC's predecessors-in-interest, ICI and ICI Americas manufactured some or all of the Paraquat that Chevron Chemical Company distributed and sold in the United States, including in New York for use in New York.

4

18.   From approximately 1964 through 1986, pursuant to distribution and licensing agreements between and among them, ICI, ICI Americas, and Chevron Chemical Company acted in concert to register, manufacture, formulate, and distribute and sell (through Chevron Chemical Company) Paraquat for use in the U.S., including in New York for use in New York, and their respective successors-in-interest, SAG, SCPLLC, and Chevron U.S.A. Inc., are jointly liable for the resulting injuries alleged herein.

19.   After 1986, SCPLLC and/or its predecessors-in-interest sold and distributed and continue to sell and distribute Paraquat in the United States, including in New York for use in New York.

20.   As a result of mergers and corporate restructuring, SAG is the successor-in-interest to ICI.

21.   As a result of mergers and corporate restructuring, SCPLLC is the successor-in-interest to ICI Americas, Inc.

22.   Thus, from approximately 1964 through the present, the Syngenta Defendants, or their predecessors-in-interest have manufactured, formulated, distributed, and sold Paraquat for use in the U.S., including in New York for use in New York.

### PLAINTIFF'S EXPOSURE TO PARAQUAT

23.   At all relevant times, Plaintiff PHILIP BAEHR was exposed to Paraquat from approximately 1966 until 2016: (1) when it was mixed, loaded, applied, and/or cleaned; (2) as a result of spray drift (the movement of herbicide spray droplets from

the target area to an area where herbicide application was not intended, typically by wind); and/or (3) as a result of contact with sprayed plants.

24.   At all relevant times, it was reasonably foreseeable that when Paraquat was used in the intended or a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to it.

25.   At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body: (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage were present); (2) through the olfactory bulb; (3) through respiration into the lungs; and (4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

**PARAQUAT CAUSES PARKINSON'S DISEASE**

26.   At all relevant times, it was reasonably foreseeable that Paraquat that entered a human body could ultimately enter the brain.

27.   At all relevant times, it was reasonably foreseeable that Paraquat that entered a human body could induce the misfolding of the alpha synuclein protein.

28.   Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system - the part of the central nervous system that controls movement.

29.   The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed),

bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

30.    Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

31.    Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression - are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

32.    There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression; and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to increasingly cause unwelcome side effects, the longer they are used.

33.    One of the primary pathophysiological hallmarks of Parkinson's disease is the selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

34.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

35.    The death of dopaminergic neurons in the SNpc decreases the production of dopamine. Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

36.    The presence of Lewy bodies (insoluble aggregates of a protein called alphasynuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

37.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

38.    Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in - if not the precipitating cause of - the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

39.    Paraquat is highly toxic to both plants and animals, creating oxidative stress that causes or contributes to cause the degeneration and death of plant or animal cells.

40.    Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and

structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

41. The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life - with photosynthesis in plant cells, and with cellular respiration in animal cells. The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells. Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

42. Paraquat's redox properties have been known to science since at least the 1930s.

43. It has been scientifically known since the 1960s that Paraquat (due to its redox properties) is toxic to the cells of plants and animals. The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons in humans—that is, Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons in the human brain by creating oxidative stress through redox cycling.

44. Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease, i.e., use in a laboratory to artificially produce the symptoms of Parkinson's disease in animals.

45. Animal studies involving various routes of exposure have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

46. Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

47. Epidemiological studies have found that exposure to Paraquat significantly increases the risk of contracting Parkinson's disease. A number of studies have found that the risk of Parkinson's disease is more than double in populations with occupational exposure to Paraquat compared to populations without such exposure.

48. These convergent lines of evidence (toxicology, animal experiments, and epidemiology) demonstrate that Paraquat exposure generally can cause Parkinson's disease.

## PARAQUAT REGULATION

49. The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides

within the U.S., requires that pesticides be registered with the U.S. Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

50.   As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

51.   As a general rule, FIFRA requires registrants, the chemical companies registered to sell the pesticides, to perform health and safety testing of pesticides. However, FIFRA does not require the EPA itself to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

52.   The EPA registers (or re-registers) a pesticide if it is persuaded, based largely on studies and data submitted by the registrant, that: (1) its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A); (2) its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B); (3) it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and (4) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

53.   FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

54. Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2). However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

55. The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person ... any pesticide which is ... misbranded." 7 U.S.C. § 136j(a)(1)(E). A pesticide is misbranded under FIFRA if, among other things: (1) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A); (2) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or (3) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

56. As a result, a pesticide may be misbranded despite an EPA determination that it met FIFRA's registration criteria. In other words, notwithstanding its

registration, a pesticide is misbranded if its label contains "false or misleading" statements, has inadequate instructions for use, or omits warnings or cautionary statements necessary to protect human health. Similarly, a pesticide may be found to cause unreasonable adverse effects on humans when used according to the approved label despite a determination by the EPA that it would not.

57.   Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA. Any allegation in this Complaint that a Defendant breached a duty to provide adequate directions for the use of or warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, concealed, suppressed, or omitted to disclose any material fact about Paraquat, or engaged in any unfair or deceptive practice regarding Paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice having rendered the Paraquat "misbranded" under FIFRA. However, Plaintiff brings claims and seeks relief in this action only under New York State Law, and does not bring any claims or seek any relief in this action under FIFRA.

## Acts of Syngenta Defendants

58.   SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland. It is a successor by merger or continuation of business to its corporate predecessors, including but not limited to ICI.

59.    SCPLLC is a limited liability company organized under the laws of the State of Delaware. It is a successor by merger or continuation of business to its corporate predecessors, including but not limited to ICI Americas. SCPLLC is registered with the State of New York, Secretary of State to do business in the State of New York.

60.    SCPLLC or its corporate predecessors have sufficient minimum contacts with the State of New York and have purposefully availed themselves of the privileges of conducting business in the State of New York, in that they:

      a)    manufactured Paraquat for use as an active ingredient in herbicides formulated and distributed for sale and use in the United States, including the State of New York;

      b)    distributed Paraquat for use as an active ingredient in herbicides formulated and distributed for sale and use in the United States, including the State of New York;

      c)    formulated Paraquat products distributed for sale and use in the United States, including the State of New York; and

      d)    distributed Paraquat products for sale and use in the United States, including the State of New York.

**DEFENDANTS' TORTIOUS CONDUCT RESULTED IN PHILIP BAEHR DEVELOPING PARKINSON'S DISEASE**

61.    Plaintiff PHILIP BAEHR hereby refers to, incorporates, and re-alleges by this reference as though set forth in full, each and every allegation hereinabove and makes them a part of the following allegations.

62.    Plaintiff PHILIP BAEHR is a resident and citizen of Niagara County, New York.

63.    Plaintiff PHILIP BAEHR was exposed to Paraquat manufactured and sold by Defendants.

64.  Plaintiff PHILIP BAEHR mixed Paraquat, transferred it into application equipment, sprayed it, harvested products sprayed with it and cleaned the applicator equipment from approximately 1966 until 2016.

65.  During this time, Plaintiff PHILIP BAEHR was in close contact to the Paraquat that was designed, manufactured, and distributed by Defendants, and each of them.

66.  During that time, Plaintiff PHILIP BAEHR would also mix, load, spray, and/or clean Paraquat.

67.  The Paraquat to which Plaintiff PHILIP BAEHR was exposed entered his body through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage are present); and/or 2) through the olfactory bulb; and/or 3) through respiration into the lungs; and/or 4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways. Once absorbed, the Paraquat entered his bloodstream, attacked his nervous system, and was substantial factor in causing him to suffer Parkinson's disease.

68.  Plaintiff PHILIP BAEHR was diagnosed with Parkinson's disease in or about 2023.

69.  Plaintiff PHILIP BAEHR had no reason to suspect the diagnosis was connected to his past Paraquat exposure.

70.  Although Plaintiff PHILIP BAEHR knew that the Paraquat to which he was exposed was acutely toxic, he had no reason to suspect that chronic, low-dose exposure to Paraquat could cause neurological diseases such as Parkinson's disease.

71.   Plaintiff PHILIP BAEHR was never told, either by a medical professional, by media, or by the Defendants, that chronic, low-dose exposure to Paraquat could cause him to suffer Parkinson's disease.

72.   Plaintiff PHILIP BAEHR first became aware of Paraquat's role in causing his Parkinson's disease and the wrongful acts of the Defendants that caused or contributed to his developing Parkinson's disease less than and within a year of the filing date of this Complaint.

73.   Plaintiff PHILIP BAEHR did not discover this earlier because he had no reason to suspect that his working with Paraquat could cause him to suffer Parkinson's disease.

74.   Defendants' acts and omissions were a legal, proximate, and substantial factor in causing Plaintiff PHILIP BAEHR to suffer severe and permanent physical injuries, pain, mental anguish, and disability, and will continue to do so for the remainder of his life.

75.   By reason of the premises, it became necessary for Plaintiff PHILIP BAEHR to incur expenses from medical care and treatment, and related costs and expenses required in the care and treatment of said injuries. Plaintiff PHILIP BAEHR'S damages in this respect are presently unascertained as said services are still continuing.

76.   By reason of the premises, it will be necessary for Plaintiff PHILIP BAEHR to incur future expenses for medical care and treatment, and related costs and expenses required for future care and treatment. Plaintiff's damages in this respect are presently unascertained as said services are still continuing. Plaintiff prays leave to insert elements of damages in this respect when the same are finally determined.

77.   By reason of the premises, Plaintiff PHILIP BAEHR has been at times unable to maintain regular employment, incurring special damages in a presently

unascertained sum as said loss is still continuing. Plaintiff prays leave to insert elements of damages with regards to past wage loss, future wage loss, and lost earning capacity when the same are finally determined.

78.    By reason of the premises, Plaintiff has suffered general (non-economic) damages in a sum in excess of the jurisdictional minimum of this court.

79.    By reason of the premises, Plaintiff has suffered special (economic) damages in a sum in excess of the jurisdictional minimum of this court.

## CAUSES OF ACTION COUNT I - STRICT PRODUCTS LIABILITY DESIGN DEFECT

80.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

81.    Defendants are liable to Plaintiff under a products liability theory for marketing a defectively-designed product, as well as for failing to adequately warn of the risk of severe neurological injury caused by chronic, low-dose exposure to Paraquat.

82.    At all relevant times, Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use in the State of New York.

83.    At all relevant times and places, the Paraquat that Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold was used in the intended or a reasonably foreseeable manner.

84.    Plaintiff PHILIP BAEHR was exposed to Paraquat that Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors designed,

manufactured, distributed, and sold. As a result of that exposure, Paraquat entered Plaintiff PHILIP BAEHR's body causing Plaintiff to develop Parkinson's disease.

85.   The Paraquat that Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold did not perform as safely as an ordinary consumer would have expected it to perform when used in the intended or a reasonably foreseeable manner, in that:

a)      as designed, manufactured, formulated and packaged Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed (or areas near where it had been sprayed); and

b)      when inhaled, ingested, or absorbed into the body, it was likely to cause neurological damage that was both permanent and cumulative, and repeated low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

86.   Alternatively, Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors' Paraquat products were defectively designed in that the risk of danger inherent in the challenged design outweighed the benefits of such design, considering, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

87.   The design defect existed when the Paraquat left Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors' possession and control.

WHEREFORE, Plaintiff respectfully requests that this Court enter

judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT II - STRICT PRODUCTS LIABILITY FAILURE TO WARN

88.   Defendants are also liable to Plaintiff under a products liability theory based on their failure to adequately warn of the risks of Paraquat.  Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

89.   When Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors manufactured and sold the Paraquat to which Plaintiff was exposed, it was known or knowable to Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors in light of scientific knowledge that was generally accepted in the scientific community that:

a.    Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.    when inhaled, ingested, or absorbed into the body, it was likely to cause latent neurological damage that was both permanent and cumulative, and that repeated, low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

90.   The risk of contracting Parkinson's disease from chronic, low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

91.   An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from chronic, low-dose exposure to Paraquat.

92.   Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors failed to warn of the potential risk of permanent, irreversible neurological damage from chronic, low-dose exposure to Paraquat, and failed to provide adequate instructions regarding avoidance of these risks.

93.   As a direct and proximate result of Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors' marketing a defective product, Plaintiff suffered the injuries described in this Complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT III - NEGLIGENCE

94.   Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

95.   Defendants had a duty to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Paraquat into the stream of commerce, including a duty

to assure that the product would not cause those exposed to it to suffer unreasonable, dangerous side effects.

96. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality control, and/or distribution of Paraquat in that Defendants knew or should have known that persons foreseeably exposed to Paraquat created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of Parkinson's disease, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

97. The negligence by Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a) Manufacturing, producing, promoting, formulating, creating, and/or designing Paraquat without thoroughly testing it;

b) Failing to test Paraquat and/or failing to adequately, sufficiently, and properly test Paraquat;

c) Not conducting sufficient testing programs to determine whether Paraquat was safe for use; in that Defendants knew or should have known that Paraquat was unsafe and unfit for use because of the dangers to those exposed to it;

d) Not conducting sufficient testing programs and studies to determine Paraquat's effects on human health even after Defendants had knowledge of studies linking Paraquat to latent neurological damage and neurodegenerative disease, including Parkinson's disease;

e)      Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Paraquat;

f)      Failing to provide adequate cautions and warnings to protect the health of persons who would reasonably and foreseeably be exposed to Paraquat;

g)      Negligently marketing, advertising, and recommending the use of Paraquat without sufficient knowledge as to its dangerous propensities;

h)      Negligently representing that Paraquat was safe for use for its intended purpose when, in fact, it was unsafe;

i)      Negligently representing that Paraquat had equivalent safety and efficacy as other forms of herbicides;

j)      Negligently designing Paraquat in a manner that was dangerous to others;

k)      Negligently manufacturing Paraquat in a manner that was dangerous to others;

l)      Negligently producing Paraquat in a manner that was dangerous to others;

m)      Negligently formulating Paraquat in a manner that was dangerous to others;

n)      Concealing information from the Plaintiff while knowing that Paraquat was unsafe, dangerous, and/or non-conforming with EPA regulations;

o)      Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Paraquat compared to other forms of herbicides; and

p)      Negligently selling Paraquat with a false and misleading label.

98. Defendants under-reported, underestimated, and downplayed the serious dangers of Paraquat.

99. Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Paraquat in that Defendants:

    a.    Failed to use ordinary care in designing and manufacturing Paraquat products so as to avoid the aforementioned risks to individuals when paraquat was used as an herbicide;

    b.    Failed to accompany Paraquat products with proper and/or accurate warnings regarding all possible adverse effects associated with exposure to paraquat;

    c.    Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the effects including, but not limited to, developing Parkinson's disease;

    d.    Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Paraquat;

    e.    Misrepresented the evidence of paraquat's neurotoxicity; and

    f.    Was otherwise careless and/or negligent.

100. Despite the fact that Defendants knew or should have known that Paraquat caused, or could cause, unreasonably dangerous health effects, Defendants continue to market, manufacture, distribute, and/or sell Paraquat to consumers.

101. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care.

102. Defendants' negligence was the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and will continue to suffer.

103. As a result of the foregoing acts and omissions, Plaintiff suffers from Parkinson's disease and related neurological issues, which are permanent and lasting in nature, physical disability, mental anguish, including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

**COUNT IV - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

104. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

105. At all relevant times, Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors engaged in the business of designing, manufacturing, distributing, and selling Paraquat and other restricted-use pesticides and held themselves out as having special knowledge or skill regarding Paraquat and other restricted-use pesticides.

106. At all relevant times, Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use in the State of New York.

24

107. Plaintiff was exposed to Paraquat that Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors designed, manufactured, distributed, and sold.

108. The Paraquat to which Plaintiff PHILIP BAEHR was exposed was not fit for the ordinary purposes for which it was used, and in particular:

a) it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b) when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

109. As a direct and proximate result of Chevron U.S.A. Inc., the Syngenta Defendants, and their corporate predecessors' breach of implied warranty, Plaintiff suffered the injuries herein described.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a  jury trial on all issues contained herein.

## COUNT V- PUNITIVE DAMAGES

110. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

111. Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Paraquat. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

112. This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Paraquat did not cause Parkinson's Disease, and that full disclosure of the true risks of Paraquat would limit the amount of money Defendants would make selling Paraquat in New York. Defendants' objective was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

113. There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiff requests punitive damages against the Defendants for the harms caused to Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest,

costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff demands judgment against the defendant on each of the above-referenced claims and causes of actions and as follows:

1.      Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.      Awarding compensatory damages to the plaintiff for past and future damages, including, but not limited to, the plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the plaintiff including healthcare costs and economic loss;

3.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

4.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the plaintiff in an amount sufficient to punish the defendant and deter future similar conduct, to the extent allowed by applicable law;

5.      Pre-judgment interest;

6.      Post-judgment interest;

7.      Awarding the plaintiff reasonable attorney's fees;

8.      Awarding the plaintiff the costs of these proceedings; and

9.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

The plaintiff hereby demands trial by jury as to all issues.


DATED:   September 9, 2025

**THE DIETRICH LAW FIRM P.C.**

/s/ Nicholas J. Shemik

By:    _____

**Nicholas J. Shemik, Esq.**
Attorneys for Plaintiff
101 John James Audubon Parkway
Buffalo, New York 14228
(716) 839-3939